**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| MERITA MERRITT BARBEE, )<br>)<br>Plaintiff. )<br>)<br>v. )<br>)<br>THE LINCOLN NATIONAL LIFE INSURANCE )<br>COMPANY, )<br>)<br>Defendant. ) | Case No. :_____<br><br>**JURY TRIAL REQUESTED** |

### PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, Merita Merritt Barbee files her Original Complaint against The Lincoln National Life Insurance Company and would respectfully show the Court as follows:

### I.
### PARTIES

1. Plaintiff Merita Merritt Barbee ("Ms. Barbee" or "Plaintiff") is a natural person and citizen of Texas who resides at 3420 Danville Drive, Kilgore, Texas 75662.

2. Defendant, The Lincoln National Life Insurance Company ("Lincoln" or "Defendant"), is an Indiana corporation with its principal place of business in Radnor, Pennsylvania. It may be served with process through its registered agent Corporation Service Company, 211 East 7th Street Suite 620, Austin TX 78701 -3218

### II.
### JURISDICTION AND VENUE

3. The jurisdiction of this Court is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1). The amount in controversy, exclusive of interest and costs, exceeds $75,000.00. Venue is proper in this judicial district by virtue of 28 U.S.C. § 1391(b)(2) because

a substantial part of the events or omissions giving rise to the claim occurred in Dallas County, Texas.

## III.
### FACTUAL BACKGROUND

**A. Lincoln Took Advantage of Plaintiff, an Elderly, Unsophisticated Investor.**

4.      Ms. Barbee is a 72-year-old retired elementary school teacher. She and her husband have lived a very modest life style in Kilgore, Texas for almost all of her life.

5.      In 2013, Ms. Barbee and her family sold the family business for a large amount of cash. Ms. Barbee, whose retirement income was only about $22,000 a year at the time of this sale, was interested in conservatively investing her share of the proceeds in municipal bonds as a way of generating income.

6.      Ms. Barbee's son recommended that Ms. Barbee confer with his friend, Lisa Bordelon ("Bordelon"), who was an investment advisor. Bordelon assisted Ms. Barbee in opening a brokerage account and purchasing some equity investments. After some time, Bordelon inquired whether Ms. Barbee had an estate plan. Ms. Barbee did not, so Bordelon promised to introduce her to a gentleman who provided "free" estate planning services.

7.      Bordelon introduced Ms. Barbee to Anthony Vaccaro ("Vaccaro") in the fall of 2015, and represented that he was an "estate planner" who would give Ms. Barbee free estate planning advice. Unbeknownst to Ms. Barbee, Vaccaro was not an attorney or certified public accountant, and was not qualified to give advice about either the tax or legal implications of an estate plan.

**B. Lincoln Used Vaccaro To Sell Plaintiff an Unsuitable Policy.**

8.      At all relevant times, Vaccaro was an agent of Lincoln, authorized to act on Lincoln's behalf, and authorized to bind Lincoln through his conduct. Lincoln is vicariously

liable for the contracts and torts of its agents and employees under the doctrine of respondeat superior. Lincoln also authorized and ratified the conduct of Vaccaro by issuing policies.

9. Vaccaro was, as his signature blocks on the insurance application and policies stated, a "licensed agent, broker or registered representative" for Lincoln who had the authority to both write and sell Lincoln policies. Vaccaro was appointed an agent for the sale of life insurance policies by Lincoln and worked on commission.

10. Vaccaro began pressuring Ms. Barbee to purchase life insurance through Lincoln. He told her that life insurance was an important "estate planning tool." In truth, Ms. Barbee did not need life insurance. Life insurance is a suitable investment in two circumstances: either a) as actual "insurance" against premature death, so that a dependent can replace the insured's income, or b) if an estate both large enough and made of illiquid assets or assets that should not be sold on the insured's death, to pay estate taxes which would otherwise be due on those assets.

11. Ms. Barbee fell into neither camp. She was elderly, retired, and had no dependents to support or income to replace, and all of her non-cash assets were readily marketable. Her home was worth about $165,000. Her income was less than $23,000 a year. Her projected estate was below or near the exemption at which no estate tax is owed. She did not need life insurance. Vaccaro, however, was heavily motivated to sell Ms. Barbee life insurance because he would earn the industry standard rate commission of 66-75% of the first year's premium. Lincoln, of course, also financially benefitted from selling Ms. Barbee the unsuitable policy.

12. In addition to wrongly telling Ms. Barbee that she needed life insurance as an estate planning tool, Vaccaro made several misrepresentations regarding the prospective Lincoln

policy during Ms. Barbee's visits to his office in Dallas and trips he made to Ms. Barbee's family farm in Gladewater, TX and family office in Kilgore, TX.

13. Vaccaro told Ms. Barbee that she needed life insurance so that her children would not have to sell any assets to pay taxes when she died. However, Vaccaro was not structuring the transaction correctly if it were to be used as an estate planning tool—which it should not have been, in Ms. Barbee's case. As Vaccaro failed to inform Ms. Barbee, if she purchased a life insurance policy and held it herself, it would be included in her estate for estate tax purposes. Ms. Barbee would have needed an irrevocable life insurance trust if she were to use life insurance to minimize the need to sell estate assets to pay federal estate tax.

14. Vaccaro also told Ms. Barbee that the initial premium would be just over a million dollars, and that she would never need to pay another premium if his projections worked as planned. He explained that the million dollar premium would be invested by Lincoln and the earnings from that million dollars would fund all future premiums. He advised Ms. Barbee that he had sold "more than a hundred" of such policies, and that nobody had ever had to pay another premium after the first year. These statements were false. In fact, Lincoln invests the premiums in index funds tied to the S&P 500, which have an average annual return of about 7%. The policy Vaccaro ultimately sold Ms. Barbee had a minimum and maximum bound on the appreciation of the policy funds of 1-12%. Moreover, the cost of insurance on such policies alone is about $27,000 a month. There is no mathematical possibility that Vaccaro had been able to structure these investment contracts to avoid the insured's necessity of paying future premiums after the first year, and that was not possible for Ms. Barbee's policy either.

15. Vaccaro advised Ms. Barbee to "borrow" a million dollars from her existing brokerage account and "pay interest on the loan." Ms. Barbee asked Vaccaro why she could not

just take a million dollars from her account and pay the premium outright, and he falsely told her that it was not a good idea to "leverage" her account. In actuality, Vaccaro planned to create a lien of over $4 million on Ms. Barbee's brokerage account and have her borrow from UMB Bank in Fort Worth, Texas to pay the premiums. The only purpose of this borrowing was to increase the financial complexity of the transaction and conceal from Ms. Barbee as long as possible that she would need to pay annual premiums; Ms. Barbee, however, could have paid the premium outright with cash on hand without affecting her very modest lifestyle.

16. Ms. Barbee, despite Vaccaro's high-pressure sales tactics, could not understand why she needed to buy life insurance. She told Vaccaro several times that she was not interested in purchasing a policy from Lincoln. In late October or early November 2015, Vaccaro changed tactics and asked Ms. Barbee to "just" fill out a Lincoln application because it would take a long time to get the application and health screening going if Ms. Barbee changed her mind. He promised to "shred" the documents if Ms. Barbee did not wish to go through with the transaction.

17. Vaccaro's representations of the time it would take to get the policy ready were also false. The policy was prepared by December 11, 2015. Vaccaro was eager to earn his commission from Lincoln. However, Ms. Barbee's husband was hospitalized with congestive heart failure over the holidays and Vaccaro could not meet with Ms. Barbee again until January 20, 2016. Ms. Barbee was especially vulnerable at this time because her husband, who she trusted to handle most of the couple's financial affairs, was hospitalized and could not accompany her or investigate Vaccaro. Vaccaro relentlessly insisted that they meet again—and covered his unwavering interest in acquiring her money by repeatedly inquiring after her

husband's health and playing to Ms. Barbee's strong religious faith by invoking his prayers for her family.

18. Ultimately, Vaccaro wrote the policy as Lincoln's agent. However, when it was ready, he did not deliver it to her. He merely brought the signature pages for the policy receipt and loan transaction and asked her to sign them. Ms. Barbee was hesitant. She asked Vaccaro if she could wait two weeks until her husband was in better health so that they could discuss it. "You don't have two weeks," said Vacarro, insisting that she needed to sign that day. Ms. Barbee asked Vaccaro again if she could "take the money out" if her husband needed additional health care, and he assured her that she could. This statement was also false. Ms. Barbee signed the Policy receipt and loan transaction signature pages, but she had never seen the policy or loan transaction documents.

19. Some weeks after Ms. Barbee signed the policy's signature page, which, upon information and belief, was also after the free look back period had commenced and potentially even expired, Ms. Barbee received a copy of the Policy, but not a copy of the UMB Bank loan documents.

   C. **Lincoln's "Policy" was a Complicated, Security-Like Equity Investment that Plaintiff Timely Asked to Cancel.**

20. The policy was a "Lincoln LifeReserve Indexed UL Accumulator (2014)," (the "Policy") which, in addition to having a universal life insurance component, is a complex investment contract or security-like equity investment. The Policy value fluctuates with market conditions and Lincoln's ability to reduce the cost of insurance.

21. After reflecting and praying on her sense of unease about the situation, Ms. Barbee called Vaccaro on January 24, 2016, and told him that she did not want the Policy and that he should follow through on his promise to cancel the transaction.

22. Vaccaro texted Ms. Barbee back on January 24, 2016: "Hey there. As of right now your policy is in place. I will be back Tuesday morning and will come straight to you and walk through how flexible the policy and the money is. I will call you Monday. I know this is new to you, but I will make sure you are comfortable. Don't stress one bit."

23. Vaccaro visited Ms. Barbee again on January 26, 2016. He did not have with him a copy of the Policy. At the meeting, he again misrepresented the terms of the Policy, describing it as "flexible" in terms of Ms. Barbee's ability to avoid paying premiums and cancel the Policy if she wished. However, the Policy was only "flexible" in changing, within certain limits, the amount of the premium, not in terms of Ms. Barbee's ability to cancel or avoid paying premiums after the first year as promised. Indeed, Ms. Barbee's Policy will require her to pay at least another million dollar premium in the third policy year or her Policy will lapse outright.

24. Nonetheless, Ms. Barbee asked Vaccaro to cancel the Policy. He did not.

25. On March 15, 2016, Ms. Barbee followed up with Vaccaro by phone to ask whether he had cancelled the Policy as instructed. He texted back, "Good morning Merita! I am working to see what I can do. As we discussed, I will be back in town next week and we will get together to discuss." He continued, "Just to help you feel better, your policy is up 6.54% since it was put in force in the beginning of February." This was not true—the Policy had been in force since January, and Vaccaro had waited out the end of the contractual "free look" period.

26. Unhappy that Vaccaro had not followed her instructions to cancel the Policy, Ms. Barbee responded, "I still do not want to be worrying the rest of my life…I do not want the insurance…thanks".

27. Vaccaro still did not tell Ms. Barbee that he had not, and would not cancel the Policy.

28. Ms. Barbee asked Vaccaro to visit her again to discuss why he had not yet cancelled the Policy, writing to him on April 4, 2016, "I want to get this behind me." Despite Ms. Barbee's pleas to cancel the Policy, Vaccaro never canceled it.

29. Instead, Vaccaro told Ms. Barbee for the first time on April 7, 2016, that the Policy could not be cancelled for four years and that it would cost Ms. Barbee over $300,000 if surrendered. Vaccaro omitted that he could have cancelled the Policy when Ms. Barbee had first asked, but he did not because he would have to return the industry standard rate commission of 66-75% from the first year's premium if the Policy were cancelled and Lincoln would lose its substantial profit on such sales of securities.

30. On May 16, 2016, Vaccaro was fired by his employer for violating the "gift, client entertainment, third party expense reimbursement and charitable contributions policy by failing to disclose benefits received from an insurance company."

31. Ms. Barbee retained new financial advisors and submitted a complaint against Vaccaro to the Texas Department of Insurance on August 10, 2016. Lincoln acknowledged receiving a copy of the complaint, but has refused to cancel the Policy as its agent, Vaccaro, had previously agreed.

32. Ms. Barbee has performed and will continue to perform under the Policy.

## IV.
## CAUSES OF ACTION

**COUNT 1: BREACH OF CONTRACT**

33. Paragraphs 4 through 32 are incorporated herein by reference.

34. This is a claim against Defendant for breach of contract.

35. Ms. Barbee and Defendant entered into a valid and enforceable agreement whereby Defendant materially breached the contract and/or was marred by Defendant's fraud.

36. Plaintiff fully and/or substantially performed under the agreement, or her performance was otherwise excused.

37. Defendant materially breached the agreement by failing to comply with the Policy to the extent to which Ms. Barbee will be deprived of: a) the benefits which she reasonably expected; and b) adequate compensation for the part of the benefits offered. Defendant's material breach results from its failure to perform as offered and promised.

38. As a direct result of the breach of contract, Plaintiff has suffered actual damages in excess of the jurisdictional limits of this Court.

39. Additionally, pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001, Plaintiff hereby seeks and is entitled to recover all of her reasonable and necessary attorneys' fees incurred in connection with this matter.

40. All conditions and notices precedent to Ms. Barbee's right to recovery have been performed, excused, waived, and/or otherwise satisfied.

41. In the alternative, there is no other adequate remedy at law which would place Ms. Barbee in the position in which she was in before the Policy due to Defendant's material breaches and fraud as illustrated herein above. Thus, rescission of the Policy is appropriate.

**COUNT 2 and 3: TEXAS DECEPTIVE TRADE PRACTICES ACT/ TEXAS INSURANCE CODE**

42. Paragraphs 4 through 32 are incorporated herein by reference.

43. Plaintiff is a consumer as defined by the Texas Deceptive Trade Practices Act ("DTPA").

44. Defendant employed the following acts and practices in violation of chapter 541 of the Insurance Code. Defendant through its authorized agent:

a)      made an untrue statement of material fact;

    b)      failed to state a material fact necessary to make other statements made not misleading, considering the circumstances under which the statements were made;

    c)      made a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact; and

    d)      made a material misstatement of law.

45.      Defendant's representations were false, misleading, and deceptive.

46.      The representations violate subdivisions (b)(5), (b)(7), (b)(12), and (b)(24) of Section 17.46 of the DTPA in that they constitute representations that the particular services and goods have particular characteristics that they do not have, quality or of that of another, representing that the agreement confers or involves rights that it does not have or involve, or by failing to disclose information about the goods or services that were known at the time of the transaction with the intention to induce Ms. Barbee into the transaction which she would have not otherwise entered into if the information had been disclosed.

47.      Defendant engaged in an unconscionable course of conduct by falsely representing that the Policy had certain characteristics that it did not.

48.      Ms. Barbee relied on these representations to her detriment.

49.      Defendant's conduct as described above was a producing cause of Plaintiff's economic damages.  As a result of Defendant's conduct, Plaintiff has suffered economic damages within the jurisdictional limits of this Court.

50.      Pursuant TEX. BUS. & COM. CODE § 17.50(b), Plaintiff hereby seeks to recover three times her economic and mental-anguish damages to the extent the jury determines that Defendant's violations of the DTPA were made knowingly or intentionally.

51.     Pursuant to TEX. BUS. & COM. CODE § 17.50(d) and TEX. INS. CODE §541.152, Plaintiff seeks and is entitled to recover her reasonable and necessary attorneys' fees from Defendant.

**COUNT 4: TEXAS SECURITIES ACT**

52.     Paragraph 4 through 32 are incorporated herein by reference.

53.     The Policy is a security under the Texas Securities Act meaning it is an investment contract in "which a person pays money to participate in a common venture or enterprise with the expectation of receiving profits, under circumstances in which the failure or success of the enterprise, and thus the person's realization of expect profits is at least predominately due to the entrepreneurial or managerial efforts of others."[1]

54.     Pursuant to Texas Securities Act § 33(A)(2), Defendant, directly or indirectly, in connection with the offering and selling of securities, namely, the Policy:

a)      has employed devices, schemes, and artifices to defraud;

b)      has made untrue statements of material facts and had omitted to state material facts necessary in order to make the statements made, in life of the circumstances which they were made, not misleading; and

c)      has engaged in acts, practices and courses of business which operate as a fraud and deceit upon Ms. Barbee.

55.     Pursuant to Texas Securities Act § 33(D)(1), as a result of these violations, Plaintiff is entitled to have the above described transaction rescinded and, upon tender of the security by Ms. Barbee, which is hereby made, to recover from it: (a) the consideration Ms. Barbee paid for the securities plus interest thereon at the legal rate from the date of payment by her, less (b) the amount of any income she received on the security, upon tender of the security.

---

[1] *See Life Partners, Inc. v. Arnold*, 464 S.W.3d 660, 681 (Tex. 2015), *reh'g denied* (Sept. 11, 2015) (construing life insurance policies as investment contracts and thus securities).

56. Pursuant to Texas Securities Act § 33(D)(6) and (7), Ms. Barbee seeks her reasonable attorneys' fees and costs.

## COUNT 5: COMMON LAW FRAUD[2]

57. Paragraph 4 through 32 are incorporated herein by reference.

58. This is an alternative claim against Defendant for common law fraud.

59. As further set forth herein, on multiple occasions between December 1, 2015 and April 6, 2016, Defendant made several false and materially misleading representations and omissions to Ms. Barbee in order to induce her to purchase the Policy from Defendant, and to benefit from Ms. Barbee's performance thereunder.

60. All of these representations made to Plaintiff were knowingly false at the time they were made, or they were made recklessly, as a positive assertion, and without knowledge of their truth. Defendant made these representations with the intent for Plaintiff to act on them. Plaintiff reasonably and justifiably relied on Defendant's false representations.

61. As a direct and proximate result of Defendant's false representations and omissions, Plaintiff has suffered actual damages in excess of $1,488,603.00, exclusive of interest and attorneys' fees. Plaintiff further seeks and is entitled to recover exemplary damages.

## COUNT 6: ESTOPPEL

62. Paragraphs 4 through 32 are incorporated herein by reference.

63. This is an alternative claim against Defendant for estoppel.

64. The Defendant made a promise to Ms. Barbee that it would cancel the Policy.

---

[2] Plaintiff recognizes that fraudulent inducement and common law fraud are separate causes of action. Plaintiff has elected to plead them together solely for purposes of identifying the fraudulent representations and omissions for purposes of Federal Rule of Civil Procedure 9(b). Plaintiff alternatively seeks recovery of her reliance damages and exemplary damages for the fraudulent representations and omissions pled herein.

65. Ms. Barbee reasonably and substantially relied on Defendant's promise to her detriment.

66. Ms. Barbee's reliance was foreseeable by Defendant.

67. Injustice can be avoided only by enforcing Defendant's promise to cancel and rescind the Policy.

### COUNT 6: NEGLIGENT MISREPRESENTATION

68. Paragraphs 4 through 32 are incorporated herein by reference.

69. This is an alternative claim against Defendant for negligent misrepresentation.

70. Defendant made representations to Plaintiff in the course of Defendant's business or in a transaction in which the Defendant had an interest.

71. Defendant supplied false information by way of misstatements of fact, misstatements of opinion, and misrepresentations by nondisclosures regarding the Policy for the guidance of others.

72. Defendant did not exercise reasonable care or competence in obtaining or communicating the information.

73. Plaintiff justifiably relied on the representations.

74. Defendant's negligent misrepresentations proximately caused Plaintiff's injuries.

## VI.
### JURY DEMAND

75. Ms. Barbee requests a jury trial of all issues in this action so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Merita Merritt Barbee, prays for judgment against the Defendant, The Lincoln National Life Insurance Company, for all actual, consequential, and equitable damages sustained, including:

a. All actual damages;
b. All consequential and incidental damages;
c. Recessionary damages, in consideration for which Plaintiff tenders her securities;
d. Reliance damages;
e. Benefit-of-the-bargain damages;
f. Out-of-pocket damages;
g. All reasonable and necessary attorneys' fees;
h. Expert witness fees;
i. Costs of court;
j. Cost of for copies of depositions;
k. Exemplary damages;
l. Pre and post-judgment interest at the highest rate allowed by law; and
m. Any such other and further relief, in both law and in equity, to which Plaintiff may show herself to be justly entitled.

Dated: March 30, 2017

Respectfully submitted,

*/s/ G. Michael Gruber*
**G. Michael Gruber**
*State Bar No. 08555400*
mgruber@getrial.com
**Tricia R. DeLeon**
*State Bar No. 24005885*
tdeleon@getrial.com
**Laura M. Fontaine**
*State Bar No. 24065239*
lfontaine@getrial.com

**GRUBER ELROD JOHANSEN HAIL SHANK LLP**
1445 Ross Avenue, Suite 2500
Dallas, Texas 75202
214.855.6800 (main)
214.855.6808 (fax)

**Attorneys for Plaintiff, Merita Merritt Barbee**